TREG TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl (Alaska Bar No. 2108081)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Phone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

FENNEMORE CRAIG P.C.
Norman D. James (AZ Bar No. 006901)
Tyler D. Carlton (AZ Bar No.035275)
2394 East Camelback Road, Suite 600
Phoenix, Arizona 85016
Phone: (602) 916-5000
Facsimile: (602) 916-5546
Email:  njames@fennemorelaw.com
        tcarlton@fennemorelaw.com
(*pro hac vice applications forthcoming*)
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, ) | |
| ) | |
| Plaintiff, ) | Case No. _____ |
| ) | |
| v. ) | |
| ) | **COMPLAINT** |
| DEB HAALAND, Secretary of the ) | |
| Interior, U.S. DEPARTMENT OF THE ) | |
| INTERIOR, TRACY STONE- ) | |
| MANNING, Director of the Bureau of ) | |
| Land Management, and BUREAU OF ) | |
| LAND MANAGEMENT, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      The State of Alaska ("Alaska" or "the State") brings suit against Deb Haaland, in her capacity as the Secretary of the Interior, the U.S. Department of Interior, Tracy-Stone Manning, in her capacity as Director of the Bureau of Land Management ("BLM"), and the BLM, a federal agency within the U.S. Department of Interior, seeking an order holding unlawful and setting aside the final rule entitled Conservation and Landscape Health, 89 Fed. Reg. 40,308 (May 9, 2024) ("the Landscape Health Rule" or "the Rule").  Defendants are collectively referred to as "the BLM," except where otherwise indicated in the context of a specific allegation.

2.      Under authority delegated by the Department of the Interior and federal law, the BLM manages about 245 million acres of federal land in the United States— more than any other federal agency.  These lands, commonly called public lands, are concentrated in the 11 contiguous western states and the State of Alaska.  In fact, Alaska alone contains over 70 million acres of public lands managed by the BLM.  Because of the magnitude of the public lands and the importance of the natural resources they possess, including oil and gas, minerals, timber, recreation, and fish and wildlife resources, the manner in which the BLM manages public lands is critically important to Alaska and its citizens, as well as to the citizens of the United States generally.

3.      The BLM's authority to manage the public lands and their resources is principally governed by the Federal Land Policy and Management Act of 1976 ("FLPMA"), codified at 43 U.S.C. §§ 1701-1787.  Under FLPMA, the public lands are

managed under principles of multiple use and sustained yield in accordance with land use

plans developed by the BLM pursuant to FLPMA in coordination with state and local

governments. *See* 43 U.S.C. §§ 1712, 1732(a).

4.      FLPMA "established a policy in favor of retaining public lands for multiple

use management." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 877 (1990).

"Multiple use management" requires the BLM to strike a balance among the many

competing uses to which the public lands can be put, "including, but not limited to,

recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving]

natural scenic, scientific and historical values." *Norton v. S. Utah Wilderness All*., 542

U.S. 55, 58 (2004) (quoting 43 U.S.C. § 1702(c)).

5.      FLPMA specifically identifies as "principal or major uses" of the public

lands "domestic livestock grazing, fish and wildlife development and utilization, mineral

exploration and production, rights-of-way, outdoor recreation, and timber production."

43 U.S.C. § 1702(l).

6.      "A second management goal, 'sustained yield,' requires BLM to control

depleting uses over time, so as to ensure a high level of valuable uses in the future."

*Norton*, 542 U.S. at 58 (quoting 43 U.S.C. § 1702(h)). "To these ends, FLPMA

establishes a dual regime of inventory and planning . . . provid[ing] for a comprehensive,

ongoing inventory of federal lands, and for a land use planning process that 'project[s]'

'present and future use.'" *Id*. (quoting 43 U.S.C. § § 1701(a)(2)).

7.      FLPMA imposes detailed requirements for the development and revision of

land use plans. *See* 43 U.S.C. § 1712. The BLM is required to "use and observe the

principles of multiple use and sustained yield set forth in [FLPMA] and other applicable law" and to "use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences" while "consider[ing] present and potential uses of the public lands." *Id.* § 1712(c)(1), (2) & (5).

8.      Importantly, FLPMA also requires that state and local governments be involved in the BLM's land use planning actions, including the development and adoption of rules and guidelines for the management and use of the public lands such as the Landscape Health Rule at issue here.  The BLM must "coordinate the land use inventory, planning, and management activities of or for [the public] lands with the land use planning and management programs of  . . . the States and local governments within which the lands are located" and "provide for meaningful public involvement of State and local government officials, both elected and appointed, in the development of land use programs, land use regulations, and land use decisions for public lands."  43 U.S.C. § 1712(c)(9).

9.      After land use plans are adopted, the BLM is authorized to issue management decisions to implement them subject to certain restrictions and limitations. *See* 43 U.S.C. § 1712(e).  For example, all BLM management decisions, including decisions that would eliminate one or more of the principal or major uses, must remain subject to reconsideration, modification, and termination through revision of the land use plan involved.  *Id.* § 1712(e)(1).  Moreover, management decisions or actions taken pursuant to a management decision that exclude one or more of the principal or major

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT
Page 4 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 4 of 39

uses for two or more years with respect to a tract of land of 100,000 acres or more must be reported to Congress and is subject to disapproval. *Id.* § 1712(e)(2).

10. In Alaska, the BLM's management authority is subject to further constraints established by the Alaska National Interest Lands Conservation Act ("ANILCA"), Pub. L. 96-487, 94 Stat. 2371 (1980). In part, ANILCA was enacted to find "the proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition." 16 U.S.C. § 3101(d). With ANILCA, Congress attempted, once and for all, to identify which lands would be placed in the conservation system and protected, which lands would be open to multiple use, and, for all practical purposes, which lands would be open to conveyance to the State and Alaska Natives.

11. ANILCA expressly recognizes and protects the ability of Alaskans to use and travel across public lands in Alaska for lawful purposes. Among other things, ANILCA Title XI, codified at 16 U.S.C. §§ 3161-3173, specifically protects Alaskans' right to gain access to State and private lands and the construction and operation of transportation and utility systems. Unlike in other BLM units, these rights of access also include the use of motorized means to cross federal lands, including wilderness and National Wild and Scenic Rivers. *See* 16 U.S.C. § 3170(a).

12. The provisions of ANILCA Title IX, codified at 43 U.S.C. §§ 1631-1638, protect the State's and Alaska Native corporations' rights to select and receive lands to fulfill the legal obligations of the United States under the Alaska Statehood Act and the Alaska Native Claims Settlement Act.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT
Page 5 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 5 of 39

13.     Perhaps most importantly, section 1326 of ANILCA—the "No More" clause—establishes that no additional lands in Alaska may be placed into the conservation system and requires Congressional approval of any withdrawal greater than 5,000 acres.  16 U.S.C. § 3213.

14.     Similarly, FLPMA imposes restrictions on the BLM's authority to withdraw public lands from entry and use.  *See* 43 U.S.C. § 1714(a) ("[T]he Secretary is authorized to make, modify, extend, or revoke withdrawals but only in accordance with the provisions and limitations of this section.").

15.     The term "withdrawal" means "withholding an area of Federal land from settlement, sale, location, or entry, under some or all of the general land laws, for the purpose of limiting activities under those laws in order to maintain other public values in the area or reserving the area for a particular public purpose or program."  *Id.* § 1702(j). Withdrawals that exceed 5,000 acres may be made for not more than 20 years and are subject to review and disapproval by Congress.  *Id.* § 1714(c).  Further, the Secretary of the Interior may only delegate her withdrawal authority to persons who have been appointed by the President with the consent of the Senate.  *Id.* § 1714(a).

16.     FLPMA requires the BLM, in "managing the public lands," to "regulate, through easements, permits, leases, licenses, published rules, or other instruments as the Secretary deems appropriate, the use, occupancy, and development of the public lands." 43 U.S.C. § 1732(b).  Such management actions are "subject to [FLPMA] and other applicable law and [made] under such terms and conditions as are consistent with such law."  *Id.*  FLPMA recognizes that these land uses will have adverse impacts, and directs

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT
Page 6 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 6 of 39

the Secretary, "by regulation, or otherwise, [to] take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.*

17.     The Landscape Health Rule dramatically alters the goals and objectives of public lands planning and management. The Rule "provides an overarching framework for multiple BLM programs to facilitate ecosystem resilience on public lands." 89 Fed. Reg. at 40,308. It also overrides policies that have governed public land planning, management, and uses for many decades, transforming the traditional multiple use-sustained yield framework in FLPMA into a program "prioritizing" vague concepts that are not found in FLPMA such as "ecosystem resilience," "landscape intactness," and "habitat connectivity." *Id.*

18.     The vast majority of the management changes adopted in the Landscape Health Rule are not authorized by FLPMA, ANILCA, or any other federal law and exceed the legal authority delegated to the BLM. In brief, these changes include:

        (a)     Modifying by rule the statutory definition of "sustained yield" adopted by Congress in FLPMA to incorporate a new extralegal concept, "ecosystem resilience."

        (b)     Requiring that the public lands be managed to promote and maintain "ecosystem resilience" and "landscape intactness"—requirements that conflict with FLPMA's multiple-use mandate.

        (c)     Defining "conservation" as the "management of natural resources to promote protection and restoration," and mandating that conservation be treated as a land

use on par with the principal or major land uses identified in FLPMA for the purpose of achieving ecosystem resilience.

(d)     Authorizing public lands to be leased for "restoration" and for "mitigation" uses, thereby precluding other land uses that are deemed "incompatible," without any legal authority to treat "restoration" and "mitigation" as valid uses of the public lands.

(e)     Authorizing large tracts of land to be set aside to promote ecosystem resilience and recovery and to maintain landscape intactness in violation of FLPMA's and ANILCA's restrictions on public land withdrawals and decisions that exclude the principal or major uses from larger-sized tracts of land.

(f)     Authorizing agency decision-makers to impose mitigation requirements on public land users without any specific legal authority to do so and without clear standards to govern these new requirements.

(g)     Modifying the regulatory definition of "areas of critical environmental concern" ("ACEC") by relaxing long-standing requirements in the BLM's planning rules, including allowing areas to be considered important, and therefore eligible to be designated an ACEC, if they contribute to ecosystem resilience, landscape intactness, or habitat connectivity, and additionally authorizing ACECs to be implemented without public participation through "temporary management."

19.     The BLM lacked legal authority to transform FLPMA by administrative fiat from a multiple use statute into a land preservation statute that marginalizes the

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                            Page 8 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 8 of 39

traditional public land uses identified in and protected by FLPMA. *See* 43 U.S.C. § 1702(l) (definition of principal or major uses").

20. Under ANILCA, the BLM lacks legal authority to establish additional conservation lands in Alaska, to set aside lands for "conservation use," or to otherwise prohibit intensive use and disposition of public lands in Alaska. *See* 16 U.S.C. §§ 3101(d), 3213.

21. The Landscape Health Rule also places at risk the numerous access protections afforded under Title XI of ANILCA and could serve unlawfully as justification to reject pending State and Alaska Native corporation land selections protected by Title IX of ANILCA.

22. The BLM has violated the Major Questions Doctrine in adopting the Landscape Health Rule to transform public lands planning and management by prioritizing ecosystem resilience and landscape intactness without an express delegation of authority for these dramatic changes. The Rule applies to the development, amendment, and revision of BLM land use plans, as well as decisions authorizing various land uses under FLPMA and its implementing regulations, including the principal or major uses of the public lands, impacting some 245 million acres of federal land—nearly one-tenth of all land in the United States. Despite the Rule's far-reaching economic and social impacts in the 11 contiguous western state and Alaska, it lacks clear Congressional authorization.

23. In adopting the Landscape Health Rule, the BLM failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, because it failed to

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT
Page 9 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 9 of 39

prepare an environmental impact statement and instead relied on a categorical exclusion that applies to administrative actions.

24.     For these reasons, and for the additional reasons alleged below, the Landscape Health Rule is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with FLPMA and other federal laws, in excess of the BLM's statutory authority, and was adopted without observance of the procedures required by law. Therefore, the adoption of the Landscape Health Rule was unlawful and should be set aside. *See* 5 U.S.C. § 706(2).

25.     To remedy the BLM's violations of federal law, Alaska asks that the Landscape Health Rule be declared unlawful and set aside, and for such other and further relief necessary to protect the multiple use-sustained yield framework for management of the public lands intended by Congress in enacting FLPMA.

## JURISDICTION AND VENUE

26.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §§ 2201-2202 (declaratory judgment and associated relief), and the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

27.     The Landscape Health Rule is a final agency action for which Alaska has no other adequate remedy in a court. *See* 5 U.S.C. § 704.

28.     Alaska has a right to judicial review of the Landscape Health Rule because Alaska has suffered legal wrong as the result of the BLM's arbitrary and unlawful action and is adversely affected by such action, which became effective on June 10, 2024, and

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                          Page 10 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 10 of 39

now governs the planning and management of over 70 million acres of public lands in Alaska.  *See* 5 U.S.C. § 702.

29.     Venue lies in this judicial district because the State of Alaska resides in this district and more than 70 million acres of public lands that are now subject to the Landscape Health Rule are located in Alaska.

## PARTIES

30.     Defendant U.S. Department of the Interior is a cabinet-level department within the Executive branch of the United States government.  Defendant Deb Haaland is the current Secretary of the Interior and is the senior official in the Department of Interior and is responsible for its policy and management decisions.

31.     The adoption of the Landscape Health Rule was approved by Steven H. Feldgus, Deputy Assistant Secretary for Land and Minerals Management.  *See* 89 Fed. Reg. at 40,337.  Mr. Feldgus was not appointed by and with the advice and consent of the Senate.

32.     Defendant BLM is an agency within the U.S. Department of the Interior. The BLM has been delegated authority to administer various laws concerning federal lands and interests including FLPMA, the Taylor Grazing Act, the Mining Law of 1872, and the Mineral Leasing Act and other federal laws that govern onshore oil and gas development on federal lands.  Defendant Tracy Stone-Manning is the current Director of the BLM and is responsible for the management of that agency.

33.     The Landscape Health Rule also states that it was promulgated by the BLM, rather than the Department of the Interior.  *See* 89 Fed. Reg. at 40,308.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                      Page 11 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 11 of 39

Consequently, both entities and their respective senior officials are joined as defendants. In addition, the BLM is joined because it will be responsible for the Rule's implementation, administration and enforcement.

34.     Plaintiff State of Alaska is a sovereign State of the United States of America and acts pursuant to its State Constitution and laws on behalf of its citizens to manage the development, use, and conservation of natural resources in Alaska, including oil and gas exploration and development, mining and mineral production, waters, fish and wildlife, and energy resources. The Alaska Constitution provides that the State "shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of the people." Alaska Const. art. 8, § 2.

35.     Alaska also brings this suit to protect its statutory rights under ANILCA and other federal laws unique to Alaska that recognize the right of Alaska and its citizens to access and use the public lands for a variety of purposes, including natural resource development and production, rights-of-way for transportation facilities and other critical infrastructure, and subsistence uses.

36.     Alaska's interests are legally protected interests that are injured by the Landscape Health Rule, which prioritizes vague, extralegal concepts such as ecosystem resilience, landscape intactness, and habitat corridors over the principal or major land uses identified in FLPMA: domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                 Page 12 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 12 of 39

37.     Without limitation, the Rule will interfere with and restrict oil and gas exploration and production and mining and mineral development on public lands in Alaska, in turn adversely impacting important revenue sources for the State and State-funded programs.  The adoption of the Rule creates significant uncertainty regarding the future availability of public lands for resource development, which discourages investment in the exploration for, and development of, resources on public lands in Alaska.  The Rule will also interfere with the ability of the State and Alaskans generally to secure rights-of-way over public lands, which are critical for access and infrastructure requirements in remote areas, as Congress acknowledged in ANILCA.

38.     These injuries are concrete and particularized and are actual or imminent as the Landscape Health Rule became effective on June 10, 2024, and is being applied and enforced by the BLM in land use planning and project-level decisions.

39.     The injuries to Alaska's interests are directly traceable to the Landscape Health Rule, which has dramatically altered planning for and management of the public lands in Alaska for the reasons alleged herein by elevating ecosystem resilience and landscape intactness over the traditional multiple use-sustained yield framework Congress enacted in FLPMA.

40.     Alaska's injuries will be redressed by a favorable decision setting aside the Landscape Health Rule and removing the unlawful requirements and restrictions imposed on the management and use of the public lands in Alaska.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                      Page 13 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 13 of 39

# CLAIMS FOR RELIEF

## Count 1

### Key Components of the Landscape Health Rule Lack
### Legal Authority and Were Unlawfully Adopted

41.     The State of Alaska hereby realleges and incorporates the allegations set forth in paragraphs 1 through 40 hereinabove.

42.     In the Landscape Health Rule, the BLM adopted and is currently implementing a number of dramatic changes to the management and use of the public lands.  These management changes have been made more than 47 years after FLPMA was enacted and without clear authorization by Congress.  As more particularly alleged below, these changes are contrary to FLPMA and other federal law, in excess of the BLM's authority, and are unlawful.

### (a)  Unlawfully Treating "Conservation" as a Land Use

43.     The Landscape Health Rule unlawfully declares that "conservation" is a land use and requires the BLM to treat conservation as a land use within the multiple use framework, including decision-making, authorization, and land use planning under FLPMA.  *See* 43 C.F.R. § 6101.5.  The BLM must now give conservation the same status as the traditional public land uses Congress specified in FLPMA, including the principal or major land uses.

44.     As commonly understood, in the context employed in FLPMA, the noun "use" means "the legal enjoyment of property that consists in its employment,

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                    Page 14 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 14 of 39

occupation, exercise of practice." Merriam-Webster's Collegiate Dictionary 1297 (10th ed. 1998) (meaning 3).

45.     Each of the principal or major uses identified in FLPMA are methods of employing the public lands and their resources for the user's benefit: domestic livestock grazing; fish and wildlife development and utilization; mineral exploration and production; rights-of-way; outdoor recreation; and timber production.  *See* 43 U.S.C. § 1702(l).  FLPMA's definition of "multiple use" contains the same traditional land uses – recreation, range, timber, minerals, watershed, and wildlife and fish, and also mentions natural scenic, scientific and historical values.  *Id.* § 1702(c).

46.     By contrast, "conservation" is not a land use.  Instead, conservation is a type of management that typically prevents or restricts land uses.  The term is defined in the Landscape Health Rule as "the management of natural resources *to promote protection and restoration*."  43 C.F.R. § 6101.4(b) (emphasis added).  This is the opposite of developing and using the public lands and their resources under the multiple use-sustained yield framework in FLPMA.

47.     The Landscape Health Rule's anomalous and unlawful treatment of conservation as a land use is shown by subpart 6102, entitled "Conservation Use to Achieve Ecosystem Resilience," in which the normal understanding of "use" is turned upside down.  This subpart requires the BLM to identify "intact landscapes" and manage these expansive landscapes "for protection."  It also requires the BLM to manage landscapes to "conserve" their "intactness," and to "maintain ecosystem resilience and habitat connectivity through conservation actions."  43 C.F.R. §§ 6102.1, 6102.2.

48.     The Landscape Health Rule ignores the fact that a majority of BLM-managed lands in Alaska are "intact landscapes."  Applying a non-impairment standard to protect "intactness" violates FLPMA section 302(a), 43 U.S.C. § 1732(a), which provides that "where a tract of . . . public land has been dedicated to specific uses according to any other provision of law it shall be managed in accordance with such law."  In Alaska, statutes such as ANILCA, the Naval Petroleum Reserves Production Act of 1976, 42 U.S.C. § 6501 *et seq.*, and the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. §1601 *et seq.*, *inter alia*, impose conflicting management priorities and requirements for public lands in Alaska, and therefore must prevail over the Rule.

49.     Conservation "use" involves protecting and preserving large, intact blocks of public land.  Nothing in FLPMA, the BLM's legal authority for the Rule, provides that conservation is a land use and should receive the same status as the traditional multiple uses of the public lands.  Instead, this land "use" is actually non-use and thus contrary to FLPMA's multiple-use mandate.  The BLM's anomalous construction of FLPMA conflicts with the statute's plain meaning and Congress's intent, and is not entitled to any deference.  *See Loper Bright Enterprises, Inc. v. Raimondo*, 144 S. Ct. 2244, 2265-66 (2024).  As the Tenth Circuit previously stated in holding that the BLM lacked authority to issue grazing permits for conservation use, "Permissible ends such as conservation . . . do not justify unauthorized means."  *Public Lands Council*, 167 F.3d at 1308.

### (b)  Unlawfully Authorizing "Restoration Leases"

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                      Page 16 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 16 of 39

50.     The Landscape Health Rule requires the BLM to "emphasize restoration on the public lands" and "employ management actions to promote restoration."  43 C.F.R. § 6102.3.  This includes issuing "restoration leases" to "qualified entities" for the purpose of "actively or passively assisting the recovery of an ecosystem that has been degraded, damaged, or destroyed to a more natural, resilient ecological state."  *Id.* § 6102.4.

51.     Restoration leases are given priority over other public lands uses, including the primary or major uses identified in FLPMA.  Once a restoration lease has been issued, the BLM is prohibited from issuing any new authorizations for the use of the leased lands if the use would be "incompatible" with restoration.  43 C.F.R. § 6102.4(A)(4).

52.     Restoration leases conflict with FLPMA's requirement that BLM management decisions or actions taken pursuant to a management decision that exclude one or more of the principal or major uses for two or more years with respect to a tract of land of 100,000 acres or more must be reported to Congress and are subject to disapproval.  43 U.S.C. § 1712(e)(2).  Restoration leases effectively withdraw land from use and occupancy by public land users and therefore conflict with FLPMA's restrictions on the Interior Department's authority to withdraw public lands aggregating 5,000 acres or more.  *See* 43 U.S.C. § 1714.

53.     The BLM lacks authority to issues leases for "actively or passively assisting the recovery of an ecosystem."  *See Public Lands Council v. Babbitt*, 167 F.3d 1287, 1307-08 (10th Cir. 1999), *aff'd* 529 U.S. 728 (2000) (holding that the BLM lacked authority under FLPMA to issue 10-year permits for "conservation use" of public land

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                    Page 17 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 17 of 39

within grazing districts, rejecting the BLM's argument that these permits would help achieve the goal of multiple use).

### (c) Unlawfully Declaring "Ecosystem Resilience" and "Intact Landscapes" Primary Land Management Objectives

54.     Nothing in FLPMA authorizes the BLM to manage the public lands to achieve "ecosystem resilience" and "landscape intactness." Yet the Landscape Health Rule mandates that the public lands be managed for such purposes. *E.g.*, 43 C.F.R. § 6102.5 ("Management Actions for Ecosystem Resilience").

55.     The Landscape Health Rule unlawfully elevates achieving and maintaining "ecosystem resilience" and "intact landscapes" into the BLM's overriding objective "when administering Bureau programs; developing, amending, and revising land use plans; and approving uses on the public lands," and by requiring the "promot[ion] [of] conservation by protecting and restoring ecosystem resilience and intact landscapes." 43 C.F.R. § 6101.2 ("Objectives").

56.     Under the Rule, the BLM is now required to "make every effort to avoid authorizing uses of the public lands that permanently impair ecosystem resilience" and must "issue decisions that promote the ability of ecosystems to passively recover or the BLM's ability to actively restore ecosystem composition, structure, and function." 43 C.F.R. § 6102.5(b).

57.     Congress, in enacting FLPMA, did not intend to make achieving and maintaining ecosystem resilience and intact landscapes important objectives that would guide the BLM's land use planning and management decision-making.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT
Page 18 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 18 of 39

58.     To support the adoption of these unlawful requirements, the BLM rewrote

the definition of "sustained yield" in the Rule by adding to the term's statutory definition,

codified at 43 U.S.C. § 1702(h), the following language:

> . . . and without permanent impairment of the productivity of the land.
> Preventing permanent impairment means that renewable resources are not
> depleted, and that desired future conditions are met for future generations.
> Ecosystem resilience is essential to BLM's ability to manage for sustained
> yield.

43 C.F.R. § 6101.4.  The BLM's need to alter FLPMA's definition of a key statutory

term to impose its newly-minted "without permanent impairment" requirement, thus

making it consistent with the agency's newly discovered management objective,

highlights the lack of statutory authority for the Rule.

59.     In short, nothing in FLPMA, including the statute's definitions of the terms

multiple use and sustained yield, provides authority for radically altering the management

of the public lands to promote vague, extralegal concepts such as ecosystem resilience

and landscape intactness, while deemphasizing FLPMA's principal or major land uses.

Moreover, as alleged hereinabove, the Rule's requirement to emphasize these concepts

conflicts with statutes that govern the management of public lands in Alaska, including

ANILCA, the Naval Petroleum Reserves Production Act of 1976, and ANCSA.

**(d)   The BLM Lacks Authority to Impose Mitigation Requirements**

60.     In addition to radically altering the manner in which the public lands are

managed, the Landscape Health Rule creates an elaborate mitigation program and

imposes mitigation obligations on public land users without authority under FLPMA or

any other federal law.  *See* 43 C.F.R. § 6102.5.1 ("Mitigation").

61.     The primary regulation that governs mitigation, 43 C.F.R. § 6102.5.1, lacks detail and, as a result, the nature of the new mitigation obligation is unclear.  Section 6102.5.1(a) provides that the BLM "will apply the mitigation hierarchy to avoid, minimize, and compensate, *as appropriate*, for adverse impacts to resources when authorizing uses of public lands" (emphasis added).  It also states that "*[a]s appropriate*, the authorized officer may identify specific mitigation approaches or requirements to address resource impacts through land use plans or in other decision documents" (emphasis added), indicating that BLM officers have unfettered discretion to impose requirements to mitigate impacts resulting from land uses authorized by FLPMA.  There are no clear standards that govern when and how much mitigation is required.

62.     Furthermore, 43 C.F.R. § 6102.5.1(b) requires the application of the mitigation hierarchy "with particular care, with the goal of eliminating, reducing, and/or offsetting impact on [important, scarce, or sensitive] resources, consistent with applicable law."  "Important resources," "scarce resources" and "sensitive resources" are vaguely defined terms that apparently include a vast array physical, biological, cultural, and scientific conditions, features, and items, such as resources determined to "warrant special consideration" and "resources that are not plentiful or abundant."  *Id.* § 6101.4(g).  Thus, impacts to almost any resource will trigger application of the "mitigation hierarchy" "with particular care," without any clear standards on what mitigation may be required.

63.     The requirement that authorized BLM officers "apply the mitigation hierarchy" is described very loosely and fails to give reasonable notice to public lands

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                    Page 20 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 20 of 39

users of what obligations might be imposed in connection with a particular project or activity.  *See* 43 C.F.R. § 6102.5.1(c).

64.     The provisions of the Landscape Health Rule dealing with mitigation lack clear standards and guidelines and fail to provide reasonable notice to the public of what will be required and under what circumstances.  For this reason, these provisions invite arbitrary and inconsistent decision-making by BLM officers.

65.     The Landscape Health Rule also establish a number of extralegal public land "uses" in order to implement the Rule's newly-created mitigation requirements.  These include "mitigation leases," "mitigation banks" and "in-lieu fee programs," none of which are authorized by FLPMA.

66.     Mitigation leases are given priority over other public lands uses, including the primary or major uses identified in FLPMA.  Once a mitigation lease has been issued, the BLM is prohibited from issuing any new authorizations for the use of the leased lands if the use would be "incompatible" with mitigation.  43 C.F.R. § 6102.4(a)(4).

67.     Both "restoration leases" and "mitigation leases" are new and unauthorized "uses" of public land that will have dramatic impacts on public land users, including substantial economic impacts on businesses that depend on public land access.  The agency's rationale for authorizing these new "uses" is tied to its unlawful goal of managing the public lands for ecosystem resilience and landscape intactness.

68.     Nothing in FLPMA authorizes the BLM to impose mitigation requirements.  The word "mitigation" is not mentioned in the statute.  Instead, adverse impacts to the public lands and their resources are governed by the "unnecessary and undue

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                           Page 21 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 21 of 39

degradation" ("UUD") standard. This standard is set forth in Section 302(b) of FLPMA, 43 U.S.C. § 1732(b), which provides: "In managing the public lands, the Secretary shall . . . take any action necessary to prevent undue and unnecessary degradation of the lands."

69.     The UUD standard itself has never been interpreted as including an obligation to mitigate adverse impacts. Its plain language anticipates that some degradation of the public lands is expected to result from land use activities and is acceptable. As alleged hereinabove, FLPMA does not contain a "without permanent impairment" standard.

70.     The BLM, for example, has defined UUD in the mining context as "impacts greater than those that would normally be expected from an activity being accomplished in compliance with current standards and regulations and based on sound practices, including use of the best reasonably available technology." 43 C.F.R. § 3802.0-5(l). This definition was adopted in 1980 and closely approximates a contemporaneous interpretation of FLPMA. While UUD was prohibited, mitigation of impacts to the public lands and their resources was not required.

71.     Since the enactment of FLPMA, the BLM has never imposed the "mitigation hierarchy" or other mitigation requirements on persons using public lands.

72.     The Landscape Health Rule fails to explain the relationship between the UUD standard that FLPMA imposes on resource management and the new mitigation requirements imposed by the BLM in the Rule. For example, it is not clear whether land uses that satisfy the UUD standard are also subject to the new mitigation requirements

imposed by the Rule, or whether these new requirements apply only in cases where the UUD standard has been violated.

73.     The BLM has failed to provide a legitimate justification for imposing the Rule's new mitigation requirements on public land users.  In the draft rule, the BLM asserted that public lands are "increasingly degraded" due to "a significant increase in authorized use."  88 Fed. Reg. at 19584.  But "authorized uses" are (i) *authorized* by FLPMA or other federal laws (e.g., the Mining Law) and therefore lawful uses of the public lands, and (ii) already governed by FLPMA's UUD standard.  An increase in uses authorized by federal law does not allow the BLM authority to impose new mitigation requirements on top of the UUD standard that is mandated by FLPMA.

74.     The BLM also asserted that adverse impacts on the public lands caused by climate change justified the imposing additional requirements on public land suers.  88 Fed. Reg. at 19584.  But future climate change impacts do not grant the BLM additional regulatory powers or allow the BLM to impose new mitigation obligations on top of the UUD standard enacted by Congress.  *See*, *e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("no matter how important, conspicuous, and controversial the issue,  . . . an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress").

75.     The Landscape Health Rule's provisions addressing mitigation are not authorized by FLPMA or any other federal law.  They also lack clear standards and fail to provide reasonable notice to public land users of their mitigation obligations.  Instead, the Rule gives essentially unfettered discretion to agency officers to establish and impose

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                       Page 23 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 23 of 39

mitigation requirements, inviting arbitrary and inconsistent decision-making and discouraging use and development of public lands and their resources. Therefore, these requirements are without or in excess of the BLM's statutory authority and are unlawful.

### (e) The Landscape Health Rule Unlawfully Modifies the Criteria For Designating Areas as ACECs

76. Areas of Critical Environmental Concern ("ACECs") are defined in FLPMA as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards." 43 U.S.C. § 1702(a). Under FLPMA, ACECs are identified through the public land planning process, which requires coordination with State and local governments and meaningful public involvement. *See* 43 U.S.C. § 1712(c).

77. The BLM's previous and long-standing planning rules addressed ACECs. *See* 43 C.F.R. §§ 1601.0-5(a) (definition of ACEC), 1610.7-2 (requirements and process for designation) (2020). Those rules, among other things, limit areas that are eligible for designation as ACECs to areas that are *relevant* (i.e., contain a *significant* historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process) and are *important* (i.e., the relevant value or resource possesses substantial significance and values). These definitions have been in place since 1983 and reflect the BLM's contemporaneous understanding of the term ACEC as used in FLPMA.

78.    The Landscape Health Rule modifies these long-standing criteria and the process for ACEC designation.  These changes are unjustified and would dramatically and improperly expand the areas that would qualify as an ACEC.

79.    Furthermore, the Landscape Health Rule authorizes BLM to accept "nominations" of areas as ACECs outside of the land use planning process, and grants State Directors discretion to determine if a nomination meets the ACEC criteria.  If it does, the State Director is given the option of either initiating a land use planning process or implementing "temporary management" to protect the area's relevant and important values.  These "temporary" ACECs will remain in effect until a new land use planning process takes place or the "temporary management" is determined to be no longer needed.  *See* 43 C.F.R. § 1610.7-2(i).

80.    There is no public participation process in connection with determining whether an area meets the ACEC criteria and should be made subject to "temporary management."  Instead, the BLM State Director decides on his own and without any public notification or public input.  Public notice is published only after an area is placed into "temporary management."  *See* 43 C.F.R. § 1610.7-2(i)(1)(ii).  This is contrary to the BLM's long-standing policy of providing the public meaningful opportunities to participate in agency planning activities and violates NEPA.  *See*, *e.g.*, *id.* § 1610.2 (public participation in resource management planning activities); *see also id.* § 1610.3-1 (requiring coordination of BLM planning efforts with State and local governments)..

81.    Normally the designation of a new ACEC would be accomplished by an amendment to the relevant BLM land use plan.  This would, in turn, require compliance

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                      Page 25 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 25 of 39

with NEPA as well as coordination with State and local governments pursuant to FLPMA and the BLM's planning regulations.  *See* 43 U.S.C. § 1712(c)(9)*;* 43 C.F.R. § 1610.3-1. The NEPA process would also require public notice and opportunities for public involvement.  *See* 43 C.F.R. § 1610.2.  The creation of an ACEC through "temporary management" allows the BLM to bypass the NEPA process and avoid coordination and other public participation requirements required by law and the BLM's regulations.

82.     Thus, the Landscape Health Rule effectively grants BLM State Directors broad discretion to designate temporary ACECs without compliance with NEPA, without coordination with State and local governments, and without any public participation— bypassing the process for amending land use plans set forth in the BLM's regulations. And once designated, these temporary designations can remain in effect indefinitely— there is no time limit.  *See* 43 C.F.R. § 1610.7-2(i)(1).  This new, open-ended authority to create temporary ACECs conflicts with FLPMA, which requires ACECs to be designated as part of the land use planning process and with meaningful coordination with State and local officials and public involvement.  Therefore, these provisions of the Rule are contrary to law.

83.     In addition, the designation of ACECs on public lands in Alaska is unlawful because such designations violate the land management requirements of ANILCA.  Section 101 of ANILCA, 16 U.S.C. § 3101(A), established that ANILCA "provides sufficient protection for the national interest in the scenic, natural, cultural and environmental values of the public lands in Alaska."  Section 1326 of ANILCA, 16 U.S.C. § 3213, prohibits the withdrawal of more than 5,000 acres of public land without

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                    Page 26 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 26 of 39

the consent of Congress. The Landscape Health Rule ignores the requirements imposed by ANILCA, which was enacted as a compromise designed to protect traditional public land uses and support economic development in Alaska.

84.     The new provisions governing ACECs adopted in the Landscape Health Rule exacerbate the conflict with ANILCA. These provisions significantly relax the standard for finding an area "important" and therefore eligible for designation. Areas that "contribute[] to ecosystem resilience, landscape intactness, or habitat connectivity" are now deemed important, regardless of their national or regional significance. 43 C.F.R. § 1610.7-2(d)(2). This goes well beyond the plain meaning of FLPMA's definition of ACECs. Almost any tract of public land could qualify as "important" under the Rule, particularly in light of the Rule's extremely broad and vague definitions of terms such as "ecosystem resilience," "landscape" and "intact landscape," and the absence of a definition of "habitat connectivity."

85.     There is no evidence that Congress intended that portions of the public lands be set aside as ACECs to contribute to ecosystem resilience or to protecting intact landscapes or habitat connectivity. This justification conflicts with FLPMA's direction to the BLM to "manage the public lands under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a). It also conflicts with the goal of Congress, when it enacted FLPMA, to ensure that land management, including withdrawals and reservations, remain under the control of Congress. *See*, *e.g.*, H.R. Rep. 94-1163, at 9 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6175, 6183.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                    Page 27 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 27 of 39

86.     As alleged above, FLPMA does not mention "ecosystem resilience," "landscape intactness" or "habitat connectivity."  Just as the BLM lacks authority to declare *ipse dixit* that the public lands must be managed to achieve these newly discovered objectives, the BLM lacks authority to declare areas to be ACECs because they "contribute" to these murky concepts.

87.     The BLM has failed to provide a reasoned explanation for substantially relaxing the standards governing the destination of ACECs, which have been in existence for some 40 years.  In 1980—four years after FLPMA was enacted, the BLM explained:

> Another basic policy established in FLPMA is that the public lands shall be managed by observing the principle of multiple use unless otherwise specified by law (Secs. 102(a)(7), 202(c)(1), and 302(a)).  *Thus, the multiple-use principle is to be used in making ACEC designation decisions*.

Areas of Critical Environmental Concern; Policy and Guidelines, 45 Fed. Reg. 57,318, 57,325 (Aug. 27, 1980).  The guidelines do not mention "ecosystem reliance," "landscape intactness," "habitat connectivity" or any similar terms.

88.     Creating ACECs based on newly discovered concepts that are not in FLPMA and have never been recognized as important objectives by the BLM before now would improperly alter the agency's long-standing policy and be inconsistent with FLPMA's multiple-use mandate.  These provisions also conflict with ANILCA's "no more" clause and would allow vast areas in Alaska to be withdrawn for conservation-related purposes.  This is unlawful and must be set aside.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                     Page 28 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 28 of 39

## Count 2

## The Landscape Health Rule Violates
## the Major Questions Doctrine

89.     The State of Alaska hereby realleges and incorporates the allegations set forth in paragraphs 1 through 88 hereinabove.

90.     Aa alleged hereinabove, the Landscape Health Rule will make dramatic changes to the manner in which the public lands are managed by the BLM, impacting more 240 million acres of land, primarily in the 11 contiguous western states and Alaska, and creating conflicts with key provisions of ANILCA.  These changes include changing the statutory definition of "sustained yield" in FLPMA to incorporate "ecosystem resilience"; treating "conservation" as a land use within FLPMA's multiple use framework; establishing "ecosystem resilience" and "intact landscapes" as overriding management objectives for the public lands; imposing mitigation requirements when public land uses are authorized; authorizing public lands to be leased for "restoration" and "mitigation" uses, and precluding any land uses deemed "incompatible" with such uses; allowing large tracts of land to be set aside in order to promote ecosystem resilience and recovery and to maintain landscape intactness without regard to FLPMA's and ANILCA's limitations on public land withdrawals and traditional use exclusions; and relaxing the statutory definition of ACEC to allow areas to be deemed "important" if they contribute to ecosystem resilience, landscape intactness, or habitat connectivity— concepts that are not mentioned in FLPMA.

91. The land management changes adopted by BLM in the Rule would override existing rules that have governed public land planning, management, and use for decades, and would transform the multiple use-sustained yield principles in FLPMA into a program prioritizing "ecosystem resilience" and managing vast areas for "healthy landscapes" and as "habitat corridors" without specific authorization from Congress.

92. The Landscape Health Rule states that it was issued under the authority of FLPMA and section 2002 of the Omnibus Public Land Management Act (16 U.S.C. § 7202). *See* 43 U.S.C. § 6101.3.

93. FLPMA does not expressly authorize the BLM's dramatic regulatory changes, which transform FLPMA from a multiple-use statute to land preservation statute that prioritizes "ecosystem resilience" and "landscape intactness."

94. Many of the key terms and concepts adopted in the Landscape Health Rule, such as "ecosystem resilience," "landscape intactness," and "habitat corridors," are not found in FLPMA, nor does FLPMA authorize the incorporation of these concepts into public land planning and management.

95. FLPMA does not recognize "conservation" as a land use that is on a par with livestock grazing, mining and mineral development, oil and gas development, timber production, and outdoor recreation.

96. FLPMA does not authorize the BLM to issue leases for the restoration of land or resources or for mitigation to offset impacts to resources resulting from other land use authorizations.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                                  Page 30 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 30 of 39

97.    Section 2002 of the Omnibus Public Land Management Act of 2009 ("OPLMA") does not provide authority for the Landscape Health Rule.  OPLMA, on its face, applies only to certain special category lands administered by the BLM that are specifically identified in that Act.  *See* 16 U.S.C. § 7202(b).  Those lands are within the National Landscape Conservation System and have their own unique management requirements.  *Id.* § 7202(c).

98.    Under the Major Questions Doctrine, where a federal agency asserts extremely broad and unprecedented authority that will have far-reaching economic and social impacts, the Supreme Court has required agencies to demonstrate a very clear delegation of authority by Congress for the adoption of dramatic changes to an established regulatory program.

99.    For example, in *West Virginia v. EPA*, the Supreme Court held that EPA lacked authority to adopt rules that would require the closure of most coal-fired power generation plants and the substitution of power generated by wind and solar facilities based on a little-used provision in the Clean Air Act.  597 U.S. 697, 710-14, 724-25 (2022).  The Court explained that EPA "claimed to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority."  *Id.* at 724.

100.    Similarly, in *Utility Air Regulatory Group v. EPA*, the Supreme Court held that EPA lacked authority under the Clean Air Act to impose greenhouse-gas emission standards on stationary sources.  573 U.S. 302 (2014).  The Court rejected EPA's argument that its interpretation of the Clean Air Act was justified as an exercise of the agency's "discretion to adopt a reasonable construction of the statute," and held that EPA's

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT
Page 31 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 31 of 39

interpretation was unreasonable "because it would bring about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization." *Id.* at 321, 324.

101.  In this case, the BLM has relied on FLPMA—a statute enacted nearly 48 years ago—to discover authority for transforming the BLM's management focus from multiple use-sustained yield to maintaining "resilient ecosystems" and "intact landscapes" and treating conservation as a land use on par with the principal or major land uses set forth in FLPMA. These changes impact more than 240 million acres of public lands concentrated in the 11 contiguous western states and Alaska. FLPMA does not contain a clear expression of Congress's intent to delegate such far-reaching authority to the BLM. Therefore, the Landscape Health Rule violates the Major Questions Doctrine and is unlawful.

## Count 3

## The Landscape Health Rule Violates ANILCA

102.  The State of Alaska hereby realleges and incorporates the allegations set forth in paragraphs 1 through 101 hereinabove.

103.  Under ANILCA, the BLM lacks legal authority to establish additional conservation lands in Alaska, to set aside lands for "conservation use," or to otherwise prohibit intensive use and disposition of public lands in Alaska. *See* 16 U.S.C. §§ 3101(d), 3213.

104.  As alleged hereinabove, Congress enacted ANILCA to ensure "the proper balance between the reservation of national conservation system units and those public

lands necessary and appropriate for more intensive use and disposition." 16 U.S.C. § 3101(d). With ANILCA, Congress attempted, once and for all, to identify which lands would be placed in the conservation system and protected, which lands would be open to multiple use, and, for all practical purposes, which lands would be open to conveyance to the State of Alaska and Alaska Natives.

105. ANILCA expressly recognizes and protects the ability of Alaskans to use and travel across public lands for lawful purposes. Among other things, ANILCA Title XI, codified at 16 U.S.C. §§ 3161-3173, specifically protects Alaskans' access to State and private lands and the construction and operation of transportation and utility systems, and adopts streamlined procedures for the approval of these facilities. Unlike in other BLM units, these rights of access also include the use of motorized means to cross federal lands, including wilderness and National Wild and Scenic Rivers. *See* 16 U.S.C. § 3170(a).

106. The provisions of ANILCA Title IX, codified at 43 U.S.C. §§ 1631-1638, protect the State's and Alaska Native corporations' rights to select and receive lands to fulfill the legal obligations of the United States under the Alaska Statehood Act and the Alaska Native Claims Settlement Act.

107. Perhaps most importantly, section 1326 of ANILCA—the "No More" clause—establishes that no additional lands in Alaska may be placed into the conservation system and requires Congressional approval for any withdrawal of public land that greater than 5,000 acres. 16 U.S.C. § 3213.

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                        Page 33 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 33 of 39

108.    The Landscape Health Rule interferes with the various rights and interests protected by ANILCA in a number of different ways.  The Rule requires the BLM to prioritize conservation as a land use, promote and maintain intact landscapes and habitat corridors, and manage public lands for ecosystem resilience, while prohibiting or restricting the principal or major land uses identified in FLPMA.  It also authorizes and prioritizes management actions that will result in public land withdrawals without Congressional approval by limiting use and access across large tracts of public land to promote landscape intactness and ecosystem resilience, including restoration and mitigation leases.  In effect, public lands in Alaska outside conservation system units will be managed to promote "conservation," i.e., "to promote protection and restoration."  43 C.F.R. § 6101.4(b) (definition of "conservation"); *see also*, *e.g.*, *id.* §§ 6101.5 ("Principles for Ecosystem Resilience"), 6102.1 ("Protection of Landscape Intactness").

109.    There is no evidence that the BLM considered, or even attempted to harmonize, the unique rights and interests protected by ANILCA.  The Rule states only that its "implementation . . . is subject to other applicable laws."  43 C.F.R. § 6101.3.

110.    Consequently, the Landscape Health Rule conflicts with and undermines the balance between the preservation of important resources and values and the economic and social needs of Alaska and its citizens enacted by Congress in ANILCA.  The Landscape Health Rule is therefore arbitrary, capricious, not in accordance with law, and in excess of the BLM's authority, and must be set aside.

## Count 4

## The BLM Failed to Comply with NEPA in Adopting the
## Landscape Health Rule

111.    The State of Alaska hereby realleges and incorporates the allegations set

forth in paragraphs 1 through 110 hereinabove.

112.    In adopting the Landscape Health Rule, the BLM failed to comply the

requirements of NEPA and its implementing regulations, as more particularly alleged

below.  *See* 40 C.F.R. §§ 1500.1–1508.2.

113.    The BLM did not prepare an environmental impact statement ("EIS") in

connection with adopting the Rule.  Instead, when it proposed the new rule in 2023, the

BLM explained that it intended to rely on the categorical exclusion ("CE") in 43 C.F.R.

§ 46.210(i) to avoid NEPA compliance.  But the agency failed to disclose the rationale

supporting the applicability of such CE, preventing the public from commenting on the

CE's applicability.  *See* Conservation and Landscape Health, 88 Fed. Reg. 19,583, 19,596

(April 3, 2023).

114.    The CE authorized in 43 C.F.R. § 46.210(i) is a catch-all that excludes from

NEPA:

> Policies, directives, regulations, and guidelines: that are of an administrative,
> financial, legal, technical, or procedural nature; or whose environmental
> effects are too broad, speculative, or conjectural to lend themselves to
> meaningful analysis and will later be subject to the NEPA process, either
> collectively or case-by-case.

115.    In the regulatory preamble to the Landscape Health Rule, the BLM

explained that this CE applied "because the rule sets out a framework but is not self-

executing in that it does not itself make substantive changes on the ground and will not (absent future decisions that implement the rule) restrict the BLM's discretion to undertake or authorize future on-the-ground action; thus, the rule is administrative or procedural in nature." 89 Fed. Reg. at 40,333. This assertion is patently erroneous. The Rule imposes new *substantive* requirements that dramatically alter the manner in which the public lands are managed (e.g., imposing mitigation requirements and altering the criteria for ACECs) and what uses are allowed (e.g., restoration and mitigation leases).

116. The BLM asserted, with no supporting explanation, that none of the extraordinary circumstances identified in the Interior Department's regulations at 43 C.F.R. § 46.215 preclude the use of a CE in this case. This was also erroneous.

117. The CEQ's regulations state that "major federal actions" include "[a]doption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act," as well as "adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and related agency decisions allocating agency resources to implement a specific statutory program or executive directive." 40 C.F.R. § 1508.1(w)(1)(ii), (iv).

118. The Landscape Health Rule has dramatically altered how some 245 million acres of public lands are managed by requiring the BLM to emphasize achievement of ecosystem resilience and protection of intact landscapes, in addition to creating new categories of leases, imposing mitigation requirements on public land users, relaxing the standards for ACEC eligibility, and allowing ACECs to be created unilaterally and without any public process by BLM State Directors through "temporary management,"

among other things.  The adoption of this new management regime clearly qualifies as a rule that adopts "group of concerted actions to implement a specific policy" and meets the definition of "major federal action" under NEPA.

119.    The Interior Department's NEPA regulations provide several different extraordinary circumstances that apply to the Landscape Health Rule and preclude the BLM's reliance on a CE.  *See* 43 C.F.R. § 46.205(c).  These extraordinary circumstances include actions that:

- Have highly controversial environmental effects or involve unresolved conflicts concerning alternative uses of available resources.

- Establish a precedent for future action or represent a decision in principle about future actions with potentially significant environmental effects.

- Have a direct relationship to other actions with individually insignificant but cumulatively significant environmental effects.

43 C.F.R. § 46.215(c), (d) & (f).

120.    In similar circumstances, the BLM has complied with NEPA by preparing an environmental impact statement in adopting programmatic rule changes.  When the BLM amended its regulations that govern the BLM's administration of livestock grazing on the public lands in 1996, the BLM analyzed the impacts of those rules in an environmental impact statement.  *See* Grazing Administration – Exclusive of Alaska, 60 Fed. Reg. 9,894, 9,957 (Feb. 22, 1995) (discussing compliance with NEPA).

121.    The BLM prepared another environmental impact statement in connection with amending its regulations governing the administration of grazing in 2006.  *See*

Grazing Administration – Exclusive of Alaska, 71 Fed. Reg. 39,402, 39,502 (July 12, 2006).

122. The Landscape Health Rule is broader in scope than the BLM's 1996 and 2006 grazing administration rule changes. It applies to all uses of the public lands and will dramatically change how the public lands are managed and what uses will be permitted by elevating "conservation" to a dominant use, requiring that the public lands be managed to promote resilient ecosystems and landscape intactness, authorizing "restoration" and "mitigation" leases, and changing the criteria and process for the designation of ACECs, among other major changes.

123. In short, given the extremely broad, programmatic nature of the Landscape Health Rule, which will apply to BLM planning activities and land use decisions affecting some 245 million acres of public lands throughout the West and Alaska, the significant controversy surrounding the unprecedented changes mandated by the Rule, and the Rule's conflicts with Congress's findings in ANILCA, the BLM's reliance on a CE was improper. Instead, the agency was required to prepare an EIS. Its failure to do so violated NEPA and supports vacatur of the Rule.

## PRAYER FOR RELIEF

The State of Alaska respectfully requests that this Court enter a judgment in its favor granting the following relief:

A. Find and declare that the Landscape Health Rule is arbitrary, capricious, in excess of the BLM's statutory authority, was adopted without observance of the procedure required by law, or otherwise not in accordance with law;

B.      Hold unlawful and set aside the Landscape Health Rule;

C.      Enjoin the implementation and enforcement of the Landscape Health Rule in Alaska;

D.      Award the State of Alaska its costs of litigation, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E.      Provide the State of Alaska such other and further relief as the Court deems just and proper in light of Defendants' violations of the law.

DATED:      July 24, 2024.

FENNEMORE CRAIG P.C.

By:      /s/ *Norman D. James*
Norman D. James (AZ Bar No. 006901)
Tyler D. Carlton (AZ Bar No. 035275)
2394 East Camelback Road, Suite 600
Phoenix, Arizona 85016
Phone: (602) 916-5000
Facsimile: (602) 916-5546
Email:  njames@fennemorelaw.com
          tcarlton@fennemorelaw.com
(*pro hac vice applications forthcoming*)

TREG TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl
(Alaska Bar No. 2108081)
Assistant Attorney General
Alaska Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, Alaska 99501
Phone:  (907) 269-5232
Facsimile:  (907) 276-3697
Email: ron.opsahl@alaska.gov

Attorneys for Plaintiff

49534309.1

*State of Alaska v. Deb Haaland, Secretary of the Interior*
COMPLAINT                                                                                          Page 39 of 39
Case 3:24-cv-00161-SLG   Document 1   Filed 07/24/24   Page 39 of 39